| | |
|---|---|
| HARLIS WOODS, | ) Case No. 1:17 C 08273 |
| | ) |
| | ) Honorable Virginia M. Kendall |
| Plaintiff, | ) |
| | ) Jury Trial Demanded |
| vs. | ) |
| | ) |
| MARYVILLE ACADEMY, EDWARD J. | ) |
| BOCK, JOHN P. MADDEN, THOMAS F. | ) |
| MEAGHER, GEORGE W. ROURKE, | ) |
| CATHERINE M. RYAN, EARL | ) |
| SEGERDAHL, WILLIE SIMMONS, JR., | ) |
| REV. JOHN P. SMYTH, JOSEPH J. | ) |
| STEVENS, THOMAS M. TULLY, | ) |
| ARTHUR R. VELASQUEZ, REV. DAVID | ) |
| RYAN, BRYAN LEWIS, JANN | ) |
| JAMESON, and DIRECTOR OF DCFS, | ) |
| JESS MCDONALD, | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

Plaintiff Harlis Woods, by his attorneys Kirkland & Ellis LLP, hereby files this Amended

Complaint against Defendants and states as follows:

## PRELIMINARY STATEMENT

1.     In the State of Illinois, children at risk of severe abuse or neglect at home may be

taken into the protective custody of the Department of Child and Family Services ("DCFS").  The

Plaintiff in this action, Harlis Woods, was such a child.  Brutalized by his mother as a young child,

he was removed from her custody in March 1991, at the age of seven, and brought under DCFS'

protection as a ward of the State.

2. But the "protection" of the State did not bring an end to his suffering. Instead, it simply marked a new and bewildering phase in his struggle—one that would last the remainder of his childhood. Like so many other children who entered into the DCFS system in the 1990s and early 2000s, Mr. Woods faced a gauntlet of poorly-run foster homes and residential facilities in his decade-long journey through the child welfare system from the age of seven until he emerged at age 17, physically and sexually abused, emotionally battered, and psychologically scarred. A prisoner today, in truth since entering the system as a seven-year old child, Mr. Woods has never been free from abuse, sexual coercion, and the psychological trauma they bring.

3. A low point of Mr. Woods' time in the DCFS system was his six-month stay at Maryville Academy from December 1995 to May 1996. During this time, 12-year-old Mr. Woods was repeatedly beaten, forced to perform and receive oral sex, and violently sodomized by a fellow resident while his repeated pleas for help to Maryville staff and management—including Defendants Jann Jameson, David P. Ryan, and Brian Lewis (the "Individual Maryville Defendants")—went unheeded.

4. While tragic, that result is sadly unsurprising. The systemic problems at Maryville were well known to Defendants. This, after all, was the facility whose staffers, on July 11, 1989, hog tied a twelve-year old boy and left him on the floor, bound, for four hours as he slowly died from positional asphyxiation in an incident that was notorious at the time DCFS placed Mr. Woods at Maryville in December 1995. During Mr. Woods' time at Maryville, a teenage resident was severely injured, and her baby died, from burns and smoke inhalation after another resident started a mattress fire. Yet it was not until December 2002, after additional highly-publicized incidents of sexual abuse, rape, and resident suicide, that DCFS finally stopped committing juvenile wards of the State to Maryville's care.

5.      The Defendants in this case bear responsibility for the physical and emotional injuries Mr. Woods endured at Maryville.  DCFS placed him there in December 1995 despite knowing that there existed a substantial risk that he would be abused.  The Maryville Defendants, acting under the authority conferred upon them by the State, created an unreasonably dangerous environment in which Mr. Woods was forced to live, and then acted with deliberate indifference to Mr. Woods' repeated reports of abuse.

6.      Mr. Woods continued to suffer additional trauma and psychiatric issues throughout his childhood.  In May 2001, while incarcerated in a juvenile detention facility where he endured weeks of sensory deprivation in solitary confinement, Mr. Woods experienced a psychotic break, complete with suicidal ideation, biting at his own flesh, and four-point restraints. Although he was able to emerge from the episode and and re-ground himself in reality, Mr. Woods in the process suppressed the memories of the abuse he suffered at Maryville as well as other facilities in the DCFS system.  It was not until 2017, after years of mental health treatment and painstaking efforts to come to terms with his suffering, that Mr. Woods remembered the traumatic events of his childhood that occurred at Maryville.

7.      Children like Mr. Woods who have suffered familial abuse so significant that they must be taken into State custody are among the most vulnerable members of our society.  Having been deprived of such fundamental needs as parental care and a safe, loving home, they should, at the absolute minimum, be entitled to their rights as secured by the United States Constitution.  Yet in Mr. Woods' case, Defendants' actions (and equally significantly, inaction) were so egregious that they deprived Mr. Woods of constitutional rights: the right not to be forced by the State to live in a situation where there was a known risk of abuse; the right not to be exposed to unreasonably dangerous conditions created by Maryville as an agent of the State; the right not to have his pleas

for help met with deliberate indifference by the Maryville employees charged with caring for him on behalf of the State.

8.  Mr. Woods can never erase the physical and emotional harm he experienced as a result of Defendants' conduct. But he is not without recourse. More than 140 years ago, Congress enacted a law, 42 U.S.C. § 1983, to bring transgressors of constitutionally-guaranteed rights to account in the federal courts. Mr. Woods brings this action under § 1983 to hold Defendants responsible for the consequences of their actions and to vindicate the constitutional rights that were denied him as a child with such devastating effect.

## NATURE OF THE ACTION

9.  Plaintiff Harlis Woods brings this action under 42 U.S.C. § 1983 for Defendants' deprivation of his constitutional rights while acting under the color of state law. Mr. Woods further brings state-law claims against Defendants for their negligent and extreme and outrageous conduct.

10.  Mr. Woods' injuries occurred while he was placed at Maryville Academy in 1995 and 1996, where he suffered physical and sexual abuse by an older child. DCFS placed Mr. Woods at Maryville Academy despite knowledge of a substantial risk that he would suffer abuse there.

11.  Mr. Woods repeatedly reported his abuse to the Individual Maryville Defendants, who were supervisors for Maryville Academy, and begged them for help. Those supervisors responsible for Mr. Woods' well-being repeatedly ignored his cries for help, and did nothing to prevent the abuse he suffered for many months in 1995 and 1996.

12.  Mr. Woods seeks relief from this Court in order to hold Defendants responsible for their negligent, outrageous, and constitutionally-deficient conduct that lead to his physical and sexual abuse while placed at Maryville Academy.

## THE PARTIES

13.     Plaintiff Harlis Woods was born and raised in Chicago.  In March 1991, at the age of seven, he was taken into DCFS custody.  Mr. Woods' claims here arise out of his period of residence in the Lewis Home housing unit at Maryville Academy from December 1995 through May 1996.

14.     Defendant Maryville Academy is a non-profit Roman Catholic institution located in Des Plaines, Illinois and authorized as a corporation by the laws of Illinois.  It holds itself out as a facility dedicated to the treatment of physically, sexually, and emotionally abused children.  From at least 1970 until 2003, it operated a licensed residential child care facility for wards of the State of Illinois placed there by DCFS.

15.     Defendants Edward J. Bock, John P. Madden, Thomas F. Meagher, George W. Rourke, Catherine M. Ryan, Earl Segerdahl, Willie Simmons, Jr., Rev. John P. Smyth, Joseph J. Stevens, Thomas M. Tully, and Arthur R. Velasquez (the "Board of Directors of Maryville Academy") were, at the time of these events, legally responsible for directing, carrying out, and consenting to the policies, functions and operations of Maryville Academy.  They were obligated to ensure that Maryville Academy operated lawfully.  They were legally responsible for the health, welfare, and safety of the children that resided there, as well as the institution's policies, both written and unwritten.

16.     Defendant Rev. David P. Ryan was, at the time of these events, the Executive Director of Maryville Academy.  As such, he was legally responsible for carrying out the functions and operations of Maryville Academy, including ensuring the health, welfare, and safety of the children that resided there.

17.     Defendant Bryan Lewis was, at the time of these events, the senior manager of the Maryville housing unit where Plaintiff was housed in 1995, referred to as Lewis Home.  Defendant

5

Lewis was legally responsible for the daily operation of this housing unit, as well as ensuring the health, welfare, and safety of the children that resided there.

18.     Defendant Jann Jameson, was, at the time of these events, an employee at Maryville Academy.  Defendant James worked in the Lewis Home housing unit where Plaintiff was housed in 1995 and 1996.  Defendant James was legally responsible for ensuring the health, welfare, and safety of the children that resided in the Lewis Home housing unit at Maryville Academy.

19.     Defendant Jess McDonald, was the Director of the DCFS from 1994-2003.  He was legally responsible for ensuring the health, welfare, and safety of the children in the care and custody of DCFS.  He was authorized by the laws of Illinois to administer rules, regulations, programs, and funds relating to the protection and care of children in the care and custody of DCFS.  He was responsible for ensuring that DCFS policies and practices conformed to Illinois and federal law.  He directed, carried out, and consented to the placement of hundreds of children at Maryville Academy.

## JURISDICTION AND VENUE

20.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of under color of law of Plaintiff's rights as secured by the United States Constitution.

21.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

22.     This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1343.

23.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b).  On information and belief, all Defendants reside in this judicial district and the events giving rise to the claims asserted herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

**I.      DCFS TAKES CUSTODY OF MR. WOODS AND PLACES HIM AT MARYVILLE ACADEMY, WHERE HE SUFFERS PHYSICAL AND SEXUAL ABUSE.**

24.      In March 1991, DCFS removed seven-year-old Mr. Woods from his mother's care due to significant physical abuse and exposure to illicit drugs in his home.

25.      Over the next 10 years, DCFS placed Mr. Woods in a variety of homes and facilities.

26.      DCFS placed Mr. Woods at Maryville Academy from December 1995 to May 1996, when he was twelve years old.

27.      Mr. Woods suffered physical and sexual abuse on multiple occasions while at Maryville Academy.

28.      At the time Mr. Woods was placed at Maryville Academy in December 1995, DCFS contracted with Maryville Academy to care for some of the children who were in DCFS custody.

29.      Prior to placing Mr. Woods at Maryville Academy, DCFS employees, including Jess McDonald, were well aware of prior incidents of physical and sexual abuse of children residing at Maryville Academy.

30.      DCFS placed Mr. Woods there despite knowledge of the substantial risk that Mr. Woods would be abused at Maryville Academy.

31.      Shortly after Mr. Woods was placed at Maryville Academy, another child ("J.A.") began to physically abuse him.

32.      Mr. Woods approached Defendant Jann Jameson, who was a supervisor of the children housed at Maryville Academy, for help.

33.     Mr. Woods approached Defendant Jameson in Maryville's lounge area at the staff desk.

34.     Mr. Woods told Defendant Jameson that J.A. had been physically abusing him.

35.     Two other staff members, Melinda and Robyn, were physically present and interacted with other staff during the time period when Mr. Woods reported the abuse to Defendant Jameson.

36.     On information and belief, Melinda and Robyn were aware of Mr. Woods' report to Defendant Jameson.

37.     Defendant Jameson took no action to report the abuse or to prevent it from happening again.

38.     Instead, Defendant Jameson told Mr. Woods to "man up" and learn how to fight and fend for himself.

39.     Even more egregiously, while other staff and residents watched, Defendant Jameson encouraged Mr. Woods and J.A. to fight in Maryville's bathroom area.

40.     Under Jameson's watch, these staff-arranged fights between children were a common practice at Maryville Academy.

41.     J.A continued to physically abuse Mr. Woods eight to ten times over the next two months.

42.     This abuse occurred in the bedrooms, bathrooms, outside of the Maryville living unit, in Maryville's common area, and in Maryville's recreation room.

43.     Defendant Jameson did not intervene or protect Mr. Woods from these abuses.

44.     After two months of abuse, Mr. Woods approached Defendant Rev. David Ryan, one of Maryville Academy's executive officers, when Defendant Ryan was visiting the campus.

45.     During the visit, Mr. Woods approached and talked to Defendant Ryan in Maryville's kitchen and dining area, where Mr. Woods was doing homework.

46.     Another Maryville Academy staff member named Robyn was present.

47.     Mr. Woods told Defendant Ryan that J.A. had been hurting him and that, despite his reports, Maryville staff were not taking action to stop his abuse.

48.     Defendant Ryan assured Mr. Woods that he would stop the abuse.

49.     However, Defendant Ryan did nothing to follow up on Mr. Woods' allegations, and he took no action to protect Mr. Woods from the physical trauma he was experiencing at Maryville Academy.

50.     Having received no help from Defendants Jameson or Ryan, Mr. Woods went to Defendant Brian Lewis, a senior manager of the Maryville Academy Lewis Home housing unit and complained of J.A's physical abuse.

51.     Mr. Woods told Defendant Lewis that J.A. was starting fights and beating him up, and that J.A. would keep beating him up if nobody stopped him.

52.     Defendant Lewis spoke to Mr. Woods and J.A. together by the staff desk in Maryville's living unit, blaming both of them for the abuse.

53.     Defendant Lewis told Mr. Woods and J.A. that he did not want to hear about any more fights between them.

54.     Mr. Lewis took no action to protect Mr. Woods from further abuse.

55.     Just days after Mr. Woods unsuccessfully sought help from Defendant Lewis, J.A. attacked Mr. Woods in the housing unit at Maryville Academy in retaliation for his complaint.

56.     Terrified, Mr. Woods curled up and tried to absorb J.A.'s attacks with both his hands and feet.

57.     Mr. Woods refused to fight J.A.

58.     When Mr. Woods refused to fight back, J.A. said that he would make Mr. Woods his "bitch."

59.     J.A. then forcfibly performed oral sex on Mr. Woods and forced him to reciprocate.

60.     J.A. forced oral sex onto Mr. Woods and forced him to reciprocate four to six more times over the following two to three weeks.

61.     After two to three weeks of J.A.'s sexual abuse, Mr. Woods again sought help and complained of this abuse to Defendant Jameson.

62.     Two to three weeks after J.A. began sexually abusing him, Mr. Woods approached Defendant Jameson at the staff desk.

63.     Mr. Woods told Defendant Jameson that J.A.'s abuse had worsened and that J.A. was now sexually abusing him.

64.     Defendant Jameson told Mr. Woods that he could not help him because he had not personally witnessed J.A.'s sexual abuse.

65.     Defendant Jameson again did nothing to protect Mr. Woods from the abuse he was suffering.

66.     Receiving no help from Defendant Jameson, Mr. Woods sought out Defendant Lewis in the hallway a few days later.

67.     Mr. Woods told Defendant Lewis that J.A. was still abusing him, and that the abuse had become sexual.

68.     Defendant Lewis became upset and told Mr. Woods to go to his room.

69.     Once again, Defendant Lewis took no action to protect Mr. Woods from being forced to engage in oral sex.

70.     Having found no help, Mr. Woods again sought out Defendant Ryan, this time in Maryville Academy's recreation center near an indoor golfing area, where a golfing instructor was also present.

71.     Mr. Woods told Defendant Ryan that he was being sexually abused by J.A.

72.     Defendant Ryan assured Mr. Woods that he would do something about the abuse.

73.     Defendant Ryan again took no action to follow up on Mr. Woods' abuse or prevent him from suffering further.

74.     Shortly after Mr. Woods complained of J.A.'s sexual abuse to the Defendants Jameson, Lewis, and Ryan, J.A. once again cornered Mr. Woods in the Maryville Academy housing unit.

75.     At this point, the Individual Maryville Defendants had each been told repeatedly about J.A.'s physical and sexual abuse of Mr. Woods, and had done nothing to stop J.A.

76.     With that knowledge, J.A. again abused Mr. Woods, this time forcibly sodomizing Woods with his finger.

77.     Mr. Woods fled to the common area and, within minutes, told Defendant Jameson in the common area that J.A. had sodomized him.

78.     Defendant Jameson was shocked and surprised, and appeared worried.

79.     Defendants Jameson and Lewis took Mr. Woods to Maryville's dining area to wait while they had a private discussion.

80.     Mr. Woods observed Defendants Jameson and Lewis having a private conversation. After that discussion, Defendant Lewis approached Mr. Woods in the dining area.

81.     Mr. Woods told Defendant Lewis that he wanted to talk to his DCFS caseworker so that he could leave Maryville Academy and escape J.A.'s abuse.

82.     Defendant Lewis told Mr. Woods that he would make sure J.A. stayed away from Mr. Woods going forward.

83.     After Defendant Lewis finally agreed to protect Mr. Woods, he suffered no further abuse at J.A.'s hands for the remaining one and one-half months that Mr. Woods stayed at Maryville Academy.

84.     In May 1996, at the age of 12, DCFS transferred Mr. Woods to Allendale Association, a different residential facility in Illinois.

## II.     MARYVILLE ACADEMY'S HISTORY OF DANGEROUS AND ABUSIVE CONDITIONS

85.     After Mr. Woods left Maryville Academy, DCFS continued to place children there until 2002.

86.     Maryville Academy was one facility owned and operated by the larger Maryville organization.  At the time of the facility's closing in 2003, Maryville was the largest network of residential facilities for children in Illinois, housing approximately 14,000 children in 21 facilities.

87.     Originally an orphanage, Maryville Academy has housed children placed there by DCFS since at least 1970.

88.     Under DCFS policy, Maryville Academy was required to report an incident of abuse within 48 hours.[1]

89.     By the time Maryville Academy closed, it had a well-documented and pervasive history of subjecting its residents to physical and sexual abuse.

---

[1] William Grady, *Reports allege girl raped at Maryville*, CHICAGO TRIBUNE (Dec. 1, 2002); Ofelia Casillas, *Maryville report on girl filed late*, CHICAGO TRIBUNE (Dec. 3, 2002).

90.     Patrick Murphy, Cook County public guardian, publically expressed concerns about "whether the youths were properly supervised at Maryville."[2]

91.     These episodes of physical and sexual abuse were publicized and well known to all Defendants.[3]

92.     For example, on June 12, 1989, DCFS placed twelve-year-old Waketta Roy Wallace at Maryville Academy.[4]

93.     A month later, on July 11, 1989, Wallace was summoned to the office of a Maryville program manager.

94.     While there, Wallace was forcefully driven to the ground against his will by multiple Maryville employees and placed on his stomach with his arms crossed in front of his abdomen and wrists held to the floor.

95.     Wallace was restrained in this position for four hours until he died from positional asphyxia.[5]

96.     The events of Wallace's death were well known to the Defendants, as Wallace's mother filed a lawsuit against Defendant Maryville Academy and a number of its employees in 1990 in the Circuit Court of Cook County.[6]

---

[2] The Associated Press, *Maryville staffers fired over rape of girl*, NWI TIMES (Dec. 20, 2002).

[3] *Id.*

[4] *Wallace v. Smyth*, 203 Ill. 2d 441, 443-44 (2002).

[5] *Id*.

[6] *Wallace, et al. v. John P. Smyth, et al.*, No. 90 L 10116 (1st. Cir Ill.).

97.     On March 16, 1996, while Mr. Woods was a resident of Maryville Academy, a fire broke out at a Maryville residential facility for troubled youths in Chicago, known as Columbus Maryville, when an unsupervised resident of the facility lit a mattress stored in a spare room.

98.     At that time, Taurus Kyles and her infant son, Emmanuel, had been placed there by DCFS.

99.     Kyles and Emmanuel were unable to escape the facility before the fire and smoke spread to their room.

100.    Although Kyles survived, Emmanuel was killed.

101.    The events of Emmanuel's death were well known to Defendants, as Kyles filed a lawsuit against Maryville in 1996.[7]

102.    In spite of these events, Maryville Academy continued to expand, as did incidents of abuse occurring on its campuses, including the physical assault perpetrated against Mr. Woods in 1995 and 1996.

103.    For example, in February 2002, a fourteen-year-old girl placed by DCFS at Maryville Academy committed suicide.

104.    DCFS publically commented on the young girl's untimely death.  The story was covered in the media.[8]

105.    On November 15, 2002, an eleven-year-old girl placed by DCFS at Maryville Academy was raped by two boys, ages 11 and 12.

106.    Maryville Academy staff claimed that they did not learn of the rape until three days later on November 18, 2002.

---

[7] *Kyles v. Maryville Academy*, 359 Ill. App. 3d 423 (1st Dist. 2005)

[8] *Girl, 14, is found dead at Maryville*, THE CHICAGO TRIBUNE (Feb. 11, 2002).

107.     The staff waited another day before questioning the two boys.

108.     The young girl did not receive medical attention until November 21, 2002, when the first initial report of the incident was filed with DCFS.

109.     As a result of the obvious negligence and disregard for the young girl's wellbeing and safety, two Maryville employees were fired and a third resigned.

110.     The State assigned two monitors to the facility.

111.     Less than a month later, in December 2002, reports emerged of an additional incident of sexual abuse at Maryville Academy.

112.     A fourteen-year-old girl called into a DCFS hotline and reported unwanted sexual contact with a boy also residing at Maryville Academy.[9]

113.     It was subsequently determined that a Maryville Academy employee witnessed the entire sexual assault but failed to report it.

114.     The employee was criminally charged with contributing to the neglect of a child.[10]

115.     In December 2002, the State placed a hold on placing any additional children at Maryville Academy.[11]

116.     The State of Illinois removed the remaining 130 children residing at Maryville Academy in 2003.[12]

---

[9] *Sexual contact at Maryville alleged*, CHICAGO TRIBUNE (Dec. 8, 2002).

[10] Patrick Olsen and Luke Seemann, *Police charge Maryville worker*, CHICAGO TRIBUNE (Dec. 9, 2002).

[11] *Id.*

[12] Ames Boykin, *Maryville at 125: A look back, and ahead*, Daily Herald (July 27, 2008).

117.     These highly-publicized incidents are indicative of a larger environment of abuse and neglect at Maryville Academy that took hold long before representative instances reached the media and the courts, but continued until the facility was closed in 2003.

118.     On information and belief, DCFS received a significant number of complaints of abuse and mistreatment at Maryville Academy that were not made public.

119.     In December 1995, when 12-year-old Mr. Woods was placed there, residents of Maryville Academy, including Plaintiff, were subjected to a pervasive and well known risk of harm due to a lack of proper supervision, an absence of corrective measures, and an unwritten policy of failing to protect children from abuse.

120.     This pervasive risk of harm was well known to all Defendants, including Jess McDonald, who continued DCFS's unlawful practice and custom of placing children—many with a history of physical and sexual abuse—at Maryville Academy until 2002, despite his legal duty to ensure the safety of children in DCFS custody.

## III.    MR. WOODS' HISTORY OF MENTAL HEALTH ISSUES CULMINATING IN THE REPRESSION OF HIS CHILDHOOD TRAUMA.

121.     Given his significant history of physical and sexual abuse, Mr. Woods has received mental health treatment for years.

122.     The psychological trauma from his abuse has significantly hindered Mr. Woods's ability to lead a productive life.  He has been in and out of prison since the late 1990s.

123.     In early 2001, while incarcerated at Western Correctional Center, 17-year-old Mr. Woods was placed in solitary confinement for an extended period of time.

124.     While in solitary confinement, around May 15, 2001, Mr. Woods experienced a psychotic break.

125. For several days during this episode, Mr. Woods was on suicide watch and had to be physically restrained to prevent him from harming himself.

126. During that event, Mr. Woods repressed many of his horrific memories of childhood abuse.

127. Mr. Woods was subsequently transferred to a psychiatric unit at the Dixon Correctional Center for recovery.

128. As a result of this severe psychiatric episode, Mr. Woods retained no memory of the abuses he experienced while a resident of Maryville Academy.

129. Years later, while still incarcerated, Mr. Woods, now in his early thirties, began working with a therapist, Linda Duckworth.

130. Ms. Duckworth suggested that Mr. Woods begin writing down his experiences as a way of processing his childhood traumas.

131. While Mr. Woods was writing the journal reflecting upon his life in May 2017, at the age of 34, painful memories of the significant and egregious physical and sexual abuse that he repeatedly suffered as a child began to come back to him.

132. Through the therapeutic process of reflection and writing down his life experiences, Mr. Woods recovered detailed memories of the significant abuse he endured as a child, including his abuse at Maryville Academy.

133. After he first remembered the abuse he suffered while under the care of DCFS and Maryville Academy, Mr. Woods promptly filed his Complaint in this matter.

## COUNT I: 42 U.S.C. § 1983 against Defendant McDonald

134. Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint, as though fully set forth herein.

135.	Under the Fourteenth Amendment of the United States Constitution, Plaintiff had a due process right not to be placed by the State in the care and custody of an institution known by the State to pose a substantial risk to his safety.

136.	Defendant McDonald, as Director, had authority to make and direct the policies of DCFS.

137.	DCFS, by and through Defendant McDonald, had a legal duty to maintain policies, practices, and customs that protected the constitutional rights of the children in its custody.

138.	Beginning as early as 1989, DCFS employees, including Defendant McDonald, knew children placed at Maryville Academy were subjected to physical and sexual abuse.

139.	The pattern of physical and sexual abuse perpetrated at Maryville Academy was pervasive and publically documented.

140.	Defendant McDonald condoned or was deliberately indifferent to this abuse, as he continued to place children, including Plaintiff, in the care and custody of Maryville Academy until 2002.

141.	As a result of Defendant McDonald's deliberate indifference, Plaintiff suffered multiple incidents of sexual assault while housed at Maryville Academy, which were either ignored or discredited by Maryville Academy employees.

142.	Plaintiff has suffered, and will continue to suffer, severe pain, mental anguish, stress, impairment of his earning capacity and an inability to lead a normal life as a direct result of the abuse he suffered while housed at Maryville Academy.

143.	Defendant McDonald, by his acts and omissions described herein, failed to protect Plaintiff from foreseeable abuse, in violation of Plaintiff's rights under the Fourteenth Amendment of the United States Constitution.

## COUNT II: 42 U.S.C. § 1983 against Defendants Board of Directors of Maryville Academy, Rev. Ryan, Bryan Lewis, and Jann Jameson for Failure to Protect

144.    Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

145.    Under the Fourteenth Amendment of the United States Constitution, Plaintiff had a due process right to be free from physical harm while in the custody and control of Maryville Academy.

146.    The Individual Maryville Academy Defendants owed Plaintiff a corresponding duty to protect Plaintiff from harm.

147.    The Individual Maryville Academy Defendants knew of a substantial risk of serious harm to Plaintiff, but unreasonably failed to act to protect him from that harm.

148.    The Individual Maryville Academy Defendants knew the policies, practices, and customs of their institution created a substantial risk of serious harm to Plaintiff, but unreasonably failed to act to protect him from that harm.

149.    As a result of the Individual Maryville Academy Defendants' deliberate indifference and failure to supervise the children in their care, Plaintiff suffered multiple incidents of sexual assault while housed at Maryville Academy, which were ignored or discredited by Maryville Academy employees, including Defendants.

150.    The utter disregard for and attempt to discredit Plaintiff's abuse shocks the conscience.

151.    Plaintiff has suffered, and will continue to suffer, severe pain, mental anguish, stress, impairment of his earning capacity and an inability to lead a normal life as a direct result of the abuse he suffered while housed at Maryville Academy.

## COUNT III: 42 U.S.C. § 1983 against Maryville Academy

152.    Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

153.    Under the Fourteenth Amendment of the United States Constitution, Plaintiff had a due process right to be free from physical harm while in the custody and control of Maryville Academy.

154.    Maryville Academy employees knew of a substantial risk of serious harm to Mr. Woods but unreasonably failed to act to protect him from this substantial risk.

155.    The deliberate indifference of Maryville Academy employees to the risk of repeated harm to Plaintiff was a result of Maryville Academy's policy and/or practice.

156.    This policy and/or practice led Maryville Academy employees to fail to protect Mr. Woods from physical harm.

157.    Maryville Academy took no steps to remedy or ameliorate the pervasive sexual and physical abuse occurring on its premises.

158.    As a result of Maryville Academy's policy and/or practice, Plaintiff suffered multiple incidents of sexual assault while housed there.

159.    Plaintiff has suffered, and will continue to suffer, severe pain, mental anguish, stress, impairment of his earning capacity and an inability to lead a normal life as a direct result of the abuse he suffered while housed at Maryville Academy.

## COUNT IV: Negligence against Defendants Maryville Academy, Board of Directors of Maryville Academy, Rev. Ryan, Bryan Lewis, and Jann Jameson

160.    Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

161.     Under Illinois law, Defendants owed Plaintiff a duty to protect him from harm at the hands of another given their status as Plaintiff's custodians.

162.     Defendants breached their duty by failing to protect Plaintiff from J.A.'s abuse.

163.     Plaintiff's abuse by J.A. was foreseeable given the pervasive sexual abuse happening at Maryville Academy and the fact that Plaintiff put Defendants on notice of his abuse.

164.     Plaintiff was harmed as a result of Defendants' failure to protect him from J.A.'s abuse.

## COUNT V: Respondeat Superior against Maryville Academy

165.     Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

166.     Under Illinois law, Maryville is liable for the tortious acts of its employees committed in the course of their employment and in furtherance of Maryville's business.

167.     Defendants Jameson, Lewis, and Ryan were employees of Maryville Academy.

168.     Defendants Jameson, Lewis, and Ryan tortiously failed to protect Plaintiff from J.A.'s abuse.

169.     Defendants Jameson, Lewis, and Ryan's tortious conduct fell within the scope of their employment, and was committed during working hours and on Maryville's premises.

## COUNT VI: Intentional Infliction of Emotion Distress against Defendants Board of Directors of Maryville Academy, Rev. Ryan, Bryan Lewis, and Jann Jameson

170.     Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

171.     The Individual Maryville Defendants' failure to protect Mr. Woods from J.A.'s abuse even after being put on notice of that abuse was extreme and outrageous.

172.     The Individual Maryville Defendants were in a position of authority relative to Mr. Woods.

173.     The Individual Maryville Defendants' conduct caused Plaintiff severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Harlis Woods respectfully requests that the Court enter judgment in his favor against Defendants Maryville Academy, Edward J. Bock, John P. Madden, Thomas F. Meagher, George W. Rourke, Catherine M. Ryan, Earl Segerdahl, Willie Simmons, Jr., Rev. John P. Smyth, Joseph J. Stevens, Thomas M. Tully, Arthur R. Velasquez, Rev. Ryan, Bryan Lewis, Jann Jameson, and Jess McDonald and award damages, attorney fees, and such other relief as the Court deems just and proper under the circumstances.

## REQUEST FOR JURY TRIAL

Plaintiff Harlis Woods hereby demands a trial by jury on all issues.

Dated: June 5, 2018                               Respectfully Submitted,

                                                  */s/ Emily Nicklin, P.C.*
                                                  Emily Nicklin, P.C.
                                                  Jonathan Lahn
                                                  Caitlin A. Kovacs
                                                  KIRKLAND & ELLIS LLP
                                                  300 N. LaSalle Street
                                                  Chicago, IL 60654
                                                  Telephone: (312) 862-2000
                                                  Facsimile: (312) 862-2200
                                                  emily.nicklin@kirkland.com
                                                  jonathan.lahn@kirkland.com
                                                  caitlin.kovacs@kirkland.com
                                                  *Counsel for Harlis Woods*