# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HARLIS WOODS,

    *Plaintiff,*

v.

MARYVILLE ACADEMY, EDWARD
J. BOCK, JOHN P. MADDEN,
THOMAS F. MEAGHER, GEORGE
W. ROURKE, CATHERINE M. RYAN,
EARL SEGERDAHL, WILLIE
SIMMONS, JR., REV. JOHN P.
SMYTH, JOSEPH J. STEVENS,
THOMAS M. TULLY, ARTHUR R.
VALASQUEZ, REV. DAVID RYAN,
BRYAN LEWIS, JANN JAMESON,
and DIRECTOR OF DCFS, JESS
MCDONALD,

    *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 17 C 8273

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

The State of Illinois removed Harlis Woods from his mother's custody when he was seven years old because she abused him. As a ward of the State, the Department of Child and Family Services ("DCSF") took care of Woods and placed him in a variety of foster homes and residential facilities over the next decade. During a six-month stay at Maryville Academy, another child physically and sexually abused Woods. Despite repeated attempts to report the incidents, Maryville staff did not intervene. This inaction culminated in Woods' rape, only after which Maryville got involved to prevent any further abuse. Emotionally and psychologically scarred, Woods sued

Maryville Academy, its Board of Directors, its Executive Director, two employees, and the DCFS Director under 42 U.S.C. § 1983 because the defendants failed to protect Woods, depriving him of his right to due process, in addition to a variety of other state-law claims.

The Maryville Defendants collectively moved to dismiss, arguing that they are not proper parties because of the state action doctrine. Jess McDonald, the former DCFS Director, individually moved to dismiss, asserting that sovereign immunity shields him from lawsuit. Because the defendants are plausible state actors, and some, including McDonald, did not personally participate in the alleged deprivation of Woods' constitutional rights, the Court grants the Maryville Defendants' motion in part and denies it in part, while granting McDonald's motion in its entirety.

## BACKGROUND

As a young boy, Woods' mother physically abused him and exposed him to illicit drugs in their home. (Dkt. 19 ¶ 24.) This conduct led DCSF to remove seven-year-old Woods from his mother's custody in 1991. *Id.* Over the next decade, DCSF placed Woods in a range of foster homes and residential facilities. *Id.* ¶ 25. One of these facilities was Maryville Academy, where Woods stayed from December 1995 to May 1996, when he was twelve-years-old. *Id.* at ¶ 26.

DCFS contracted with Maryville Academy to care for some of the children in its custody. *Id.* ¶ 28. Maryville Academy was one facility owned and operated by the larger Maryville organization, which was the largest residential facility network in Illinois, housing approximately 14,000 children across 21 locations. *Id.* ¶ 86. State

policy required Maryville to report an incident of abuse within 48 hours. *Id.* ¶ 88. Many state employees, including Jess McDonald—the Director of DCFS—were aware of incidents of child abuse at Maryville. *Id.* ¶ 29. Despite having the knowledge of the substantial risk of abuse, DCFS placed Woods there anyway. *Id.* ¶ 30.

Shortly after arriving at Maryville, another child ("J.A.") began to physically abuse Woods. *Id.* ¶ 31. Woods reached out to Jann Jameson, a supervisor at Maryville, and asked for help. *Id.* ¶ 32. Jameson, however, took no action to report the abuse or prevent it from happening again. *Id.* ¶ 37. Instead, Jameson told Woods to "man up" and fight back. *Id.* ¶ 38. Jameson and his staff commonly arranged fights between the children at Maryville. *Id.* ¶¶ 39–40. Over the next two months, J.A. abused Woods eight to ten more times. *Id.* ¶ 41. Jameson never intervened. *Id.* ¶ 43.

Woods next tried approaching Reverend David Ryan, Maryville's Executive Director, when Ryan was visiting the campus. *Id.* ¶ 44. Woods described the abuse and the staff's failure to stop it. *Id.* ¶ 47. Ryan assured Woods that he would stop the abuse, however he never followed up. *Id.* ¶¶ 48–49. Because Jameson and Ryan did not assist him, Woods went to Brian Lewis, the senior manager of his housing unit, to complain about the abuse. *Id.* ¶ 50. Lewis brought the two boys together and blamed them both for fighting. *Id.* ¶ 52. After that, Lewis took no further action, telling the boys that he did not want to hear about it anymore. *Id.* ¶¶ 53–54. Because Woods complained, J.A. retaliated and attacked him a few days later. *Id.* ¶ 55. With Woods refusing to fight back, J.A. said that he would make Woods his "bitch," and

then forcibly performed oral sex on Woods, making him reciprocate. *Id.* ¶¶ 57–59. J.A. forced oral sex four to six more times over the next few weeks. *Id.* ¶ 60.

After this repeated sexual abuse, Woods again sought the aid of Jameson. *Id.* ¶ 61. Because Jameson had not witnessed these acts, he told Woods that he could not help him. *Id.* ¶ 64. Thereafter, Jameson failed to protect Woods. *Id.* ¶ 65. Seeing that he was receiving no assistance, Woods looked for and found Lewis. *Id.* ¶ 66. After Woods recounted the forced sex acts, Lewis became upset, but took no action in response. *Id.* ¶¶ 68–69. Still having no support, Woods returned to Ryan and told him about the sexual abuse. *Id.* ¶¶ 70–71. Ryan reassured Woods that he would do something about it, but he never did. *Id.* ¶¶ 72–73.

Shortly after Woods voiced these complaints, J.A. cornered him again, forcibly sodomizing Woods with his finger. *Id.* ¶¶ 74, 76. Woods ran away, and within minutes, told Jameson about what happened. *Id.* ¶ 77. This shocked and apparently worried Jameson, because he and Lewis took Woods away with them while they privately discussed the matter. *Id.* ¶¶ 78–79. After the conversation, Woods told Lewis that he wanted to speak with his DCFS caseworker so that he could leave Maryville and escape the abuse. *Id.* ¶ 81. Lewis responded and said that he would make sure that J.A. stayed away from Woods in the future. *Id.* ¶ 82. With that, Woods suffered no further abuse for the remaining six weeks that he stayed at Maryville. *Id.* ¶ 83. In May 1996, DCFS transferred Woods to another residential facility. *Id.* ¶ 84.

Since experiencing his trauma, Woods has been in and out of prison. *Id.* ¶ 122. In 2001, Western Correctional Center placed 17-year-old Woods in solitary

confinement for an extended period. *Id.* ¶ 123. During this time, Woods experienced a psychotic break, requiring the prison staff to physically restrain him and keep him on suicide watch. *Id.* ¶ 125. Amid that traumatic event, Woods repressed many of his childhood memories, including those of his abuse. *Id.* ¶ 126. As a result, Woods retained no memory of the Maryville incidents. *Id.* ¶ 128. Years later, Woods began working with a therapist in prison. *Id.* ¶ 129. The therapist suggested that he write down his experiences to help process his childhood trauma. *Id.* ¶ 130. In May 2017, detailed memories of his time at Maryville began to return to Woods. *Id.* ¶ 131–32.

DCFS placed children at Maryville until 2002. *Id.* ¶ 85. It also received a significant number of complaints regarding Maryville that were never made public. *Id.* ¶ 118. In December 2002, the State assigned two monitors to Maryville. *Id.* ¶ 110. That same month, the State placed a hold on sending any more children there. *Id.* ¶ 115. Then, in 2003, the State removed the remaining children from Maryville. *Id.* ¶ 116. By the time Maryville closed, it had a documented history of child abuse. *Id.* ¶¶ 89–91, 96, 101, 104, 106, 109, 111, 113–14. Because of the abuse he suffered while under the care and custody of DCFS and Maryville, Woods sued. *Id.* ¶ 133.

## STANDARD OF REVIEW

A complaint must "'state a claim to relief that is plausible on its face.'" *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a "'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin.*

*Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Conclusory statements do not suffice. *See id.* In construing the complaint, the Court accepts all the well-pleaded facts as true and "'draw[s] all reasonable inferences in favor of the plaintiff.'" *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)).

## ANALYSIS

Woods brings three failure-to-protect claims under 42 U.S.C. § 1983: the first against Jess McDonald, the former Director of DCFS; the second against the Maryville Academy Board of Directors and three employees, Reverend Ryan, Bryan Lewis, and Jann Jameson; and the third against Maryville Academy itself. Fourth, Woods asserts negligence against Maryville, its Board, and the three employees involved. Fifth, Woods alleges respondeat superior against Maryville based on the negligence of those three employees. Sixth, Woods complains of intentional infliction of emotional distress against the Board and the three employees.

Former Director McDonald moved to dismiss the claims against him from this action, arguing that either the Eleventh Amendment bars them, and even if it does not, McDonald claims that Woods did not allege that McDonald personally participated in Woods' placement at Maryville. The rest of the defendants ("the Maryville Defendants") moved to dismiss the remaining claims, contending that they are not state actors for constitutional purposes, in addition to the fact that Woods failed to

satisfy the heightened pleading standard for his intentional infliction of emotional distress claim.

## I. § 1983 Claims

Federal civil rights statutes, including Section 1983, prohibit "unconstitutional actions by persons acting under the color of state law." *Cosgriff v. Cty. of Winnebago*, 876 F.3d 912, 915 (7th Cir. 2017), *cert. denied sub nom. Cosgriff v. Winnebago Cty., Ill.*, 138 S. Ct. 1991 (2018). To state a claim under the statute, then, a plaintiff must plausibly allege that the defendants: (1) acted under the color of state law; and (2) deprived her of a constitutional right. *See Estate of Perry v. Wenzel*, 872 F.3d 439, 452 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1440 (2018) (citing *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017)).

As a general matter, the Due Process Clause protects people from the states and does not affirmatively require the states to protect their citizens from private actors. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195 (1989). If a state has a "special relationship" with an individual, however, then it "'assumes at least a rudimentary duty of safekeeping.'" *Reed v. Palmer*, No. 18-1429, 2018 WL 4870351, at *7 (7th Cir. Oct. 9, 2018) (quoting *Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895, 900 (7th Cir. 1997)). A state has a special relationship with a person when it has custody over that person, "'cutting off alternate avenues of aid.'" *Id.* (quoting *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)).

The Seventh Circuit applies this exception to the "no-duty rule" to cases where "'the State removes a child from her natural parents.'" *Id.* (quoting *Hutchinson ex*

*rel. Baker*, 126 F.3d at 900, then citing *Camp v. Gregory*, 67 F.3d 1286, 1296–98 (7th Cir. 1995), then citing *K.H. v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990)). Consequently, once a state removes a child from her parents' custody, it assumes a duty of safekeeping because of the resulting restrictions on the child's liberty. *See id.* (quoting *Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002), *as amended on denial of reh'g* (June 26, 2002)). A state violates this duty when it fails to protect a child from sexual abuse while in its custody. *See Woods v. Illinois Dep't of Children & Family Servs.*, 710 F.3d 762, 763–64 (7th Cir. 2013) (citing *K.H.*, 914 F.2d at 849, then citing *Slade v. Bd. of Sch. Dirs. of City of Milwaukee*, 702 F.3d 1027, 1030 (7th Cir.2012)). Therefore, in the foster care context, a child has a constitutional right to a safe and secure placement. *See Waubanascum v. Shawano Cty.*, 416 F.3d 658, 665 (7th Cir. 2005).

The Seventh Circuit applies a "modified deliberate indifference standard" in these cases where "the state must have actual knowledge or suspicion of the risk of harm the child may suffer while in foster care." *Id.* at 666–67. Only if the state knows or suspects that the child may be subject to sexual or other abuse can the custodian be "fairly considered an instrument of the state for child abuse." *K.H.*, 914 F.2d at 852. "The standard set forth in *K.H.* and *Lewis* differs from the 'deliberate indifference' standard only in the sense that it can be satisfied by proof of a state actor's knowledge *or suspicion* of the risk of harm, rather than just knowledge. Both standards are subjective." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 792 (7th Cir. 2003) (emphasis in original).

### A.    McDonald (Count I)

The first issue for Defendant McDonald is in what capacity Woods sued him. The Eleventh Amendment to the Constitution bars most claims against the states. *See Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 403 (7th Cir. 2018). Section 1983 does not authorize them either. *See id.* (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)). An aggrieved individual, then, is left to recover from individual state officials in one of two ways: either sue the official in her official capacity for injunctive relief or sue the official in her individual capacity for money damages. *See id.* (citing *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000)). That said, holding an individual liable under Section 1983 "'requires personal involvement in the alleged constitutional deprivation.'" *Id.* at 401 (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017)). "'The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct.'" *Id.* (quoting *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)).

Here, Woods sued McDonald in his individual capacity, *not* his official capacity as Director of DCFS. (Dkt. 53 at 4.) Woods seeks to hold McDonald accountable for his alleged tortious conduct in placing Woods at Maryville. *Id.* at 4–5. The problem for Woods, though, is that he did not allege that McDonald had some personal involvement in Woods' placement. Woods did not state that McDonald directed, consented to, or carried out this specific decision. *See Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) (explaining that "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might

see") (internal citations and quotations omitted). To the contrary, McDonald's "capacity as DCFS director by its nature distanced him from the actions about which [Woods] complains." *Volk v. Coler*, 845 F.2d 1422, 1431–32 (7th Cir. 1988). Indeed, his exercise of a higher-level management role does not comport with personal responsibility for the challenged placement decision. *See J.H. ev rel. Higgin*, 346 F.3d at 795.

Liability will only arises for McDonald if he knew of or suspected Woods' abuse at Maryville because "there is no liability under § 1983 for what a defendant 'should have known,' nor is there an affirmative duty of inquiry on the defendants' part to learn disqualifying information." *Id.* (internal citations omitted). There are no allegations that McDonald himself was personally aware of Woods' reports to Maryville staff members. Nor can he be held vicariously liable as a supervisory officeholder for the acts and omissions of those subordinates. McDonald's lack of personal participation in the placement is fatal to Woods' 1983 claim against him. Accordingly, the Court grants McDonald's motion to dismiss Count I.

### B.     The Maryville Defendants (Count II–III)

The Maryville Defendants argue that Woods did not state a claim upon which relief may be granted because they are not state actors. As a threshold matter, Woods alleges Count II against the Maryville Academy Board of Directors, Reverend Ryan, Bryan Lewis, and Jann Jameson, and Count III against Maryville Academy. But for the same reasons that McDonald's lack of personal participation mandated dismissal of the § 1983 claim against him, so, too, does the individual board members' lack of

personal involvement require dismissal of Count II against them. If facts adduced in discovery prove otherwise, Woods may seek leave to join the Board back into Count II. In the meantime, and for the reasons stated previously, the Court grants the Board's motion to dismiss Count II as it applies to the Board.

Moving to the other Maryville Defendants, private persons or entities generally do not act under the color of state law unless they are "willful participant[s] in joint activity with the State or its agents." *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). "At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (internal citations and quotations omitted). "This requires evidence of a *concerted effort* between a state actor" and the private individual or organization. *L.P.*, 852 F.3d at 696 (internal citations and quotations omitted) (emphasis in original).

The Supreme Court uses a variety of tests to decide whether someone is a state actor, including the "symbiotic relationship test, the state command and encouragement test, the joint participation doctrine, and the public function test." *Listecki*, 780 F.3d at 738 (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823–24 (7th Cir. 2009)); *see Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815–16 (7th Cir. 2009). Here, the parties focus on two of those inquiries: the close nexus (joint participation) test and the symbiotic relationship test.

### 1.    Private Child Care Institutions

In *Perez v. Sugarman*, the Second Circuit held that private child care institutions may be liable under the Due Process Clause as state actors.  499 F.2d 761, 765 (2d Cir. 1974).  There, a mother sued city employees and private institutions, alleging that the city removed the children and the institutions detained them for over two years knowing that there was no consent, court order, or hearing.  *Id.* at 763.  The institutions argued that their actions in detaining the children were not "state action" but instead private action outside the purview of Section 1983.  *Id.* at 764.  The Second Circuit disagreed, holding that "in accepting and retaining custody of children alleged to have been 'neglected' or 'abandoned,' child-caring institutions of the type we have in this case perform a 'public function.'"  *Id.* at 765.  The court reasoned that "the statutory scheme expressly contemplates that in performing this public function of caring for children the State may utilize private entities of the sort we have here."  *Id.*

After considering the public function theory and the "comprehensive statutory regulatory scheme," which indicated the extent "to which the State has insinuated itself into the actions of the private defendants here," the court recognized that "the State's ability to remove the children from the institution at any time" illustrated its "absolute dominion . . . over the private institutions . . ."  *Id.* at 765–66 (citation omitted).  Indeed, "while the State may have yielded physical possession of the children, at no time did it, or indeed could it, relinquish effective legal control over them."  *Id.* at 766.  The "exercise of the administrative placing prerogative" did not affect "the

State's ultimate responsibility for the well-being of the children . . ." *Id.* at 765. The State, in effect, depended on those private parties to care for the children in its custody, and that helped show how intimate their working relationship was. *See id.* at 766.

The Second Circuit stands by its precedent. *See Duchesne v. Sugarman*, 566 F.2d 817, 822 n.4 (2d Cir. 1977) (reaffirming *Perez* after considering intervening Supreme Court precedent); *see also Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 137 (2d Cir. 1981) (considering the state's duty and standard of care, but implicitly assuming that private placement agency was a state actor when it failed to supervise the child's placement and failed to report the situation). Other courts outside the Second Circuit, including two in this District, hold that a state's exercise of its custodial power in this way establishes the requisite nexus: The State provides the care through the private institutions. *See, e.g., Zemola v. Johnson*, No. 89 C 0798, 1989 WL 88229, at *4 (N.D. Ill. July 26, 1989); *McAdams v. Salem Children's* Home, 701 F. Supp. 630, 635 (N.D. Ill. 1988). The state courts agree. *See, e.g., Cummings v. Charter Hosp. of Las Vegas, Inc.*, 896 P.2d 1137, 1144–45 (Nev. 1995) (ruling that private child-care institutions acted under the color of state law); *State ex rel. Howard v. Ferreri*, 639 N.E.2d 1189, 1194 (Ohio 1994); *Rathbun v. Starr Commonwealth For Boys*, 377 N.W.2d 872, 877 (Mich. Ct. App. 1985) (same); *Under 21, Catholic Home Bureau for Dependent Children v. City of New York*, 481 N.Y.S.2d 632, 642 (N.Y. Sup. Ct. 1984) (same).

Many federal courts of appeals also reason that cases in front of them might be different if the child is a ward of the state and the state provides care through a private institution. *See Leshko v. Servis*, 423 F.3d 337, 345–46 (3d Cir. 2005) (discussing the institutional setting); *Keyes v. Huckleberry House*, 936 F.2d 578 (9th Cir. 1991) (touching on a child's status as a ward and the use of a private agency); *Taylor v. First Wyoming Bank, N.A.*, 707 F.2d 388, 390 (9th Cir. 1983) (same); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 n.9 (1989) ("Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home *operated by its agents*, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect.") (emphasis added).

## 2. Child Custody

These decisions generally align with the Seventh Circuit's teachings in *K.H. v. Morgan.* In that case, the court assumed, without deciding, that "foster parents, even if paid by the state, are not state agents for constitutional purposes." 914 F.2d 846, 852 (7th Cir. 1990). Although the court principally dealt with the issue of whether the state owed children a constitutional duty in placing them in foster care settings, the court's recognition that the state did in fact owe such a duty helps to illustrate the state action question presented here. The court held that a state, acting as a child's guardian, cannot place her in an environment knowing or suspecting that the child will suffer harm there. *See id.*; *see also Camp v. Gregory*, 67 F.3d 1286, 1293–94 (7th Cir. 1995). Furthermore, the court assumed that this duty to place did not

extend into a duty to monitor *if the defendants were foster parents*. *K.H.*, 914 F.2d at 852.

If the defendants were not foster parents, however, and instead private child care institutions that failed to investigate or report incidents of abuse, then that might be a different story. In *Reed v. Palmer*, the State placed plaintiffs in an out-of-state institution, not a private foster home. *See* No. 18-1429, 2018 WL 4870351, at *8 (7th Cir. Oct. 9, 2018). Regardless, the court restated the constitutional right as "the right of a child in state custody not to be handed over by state officers to a foster parent *or other custodian, private or public* whom the state knows or suspects to be a child abuser." *Id.* (emphasis in original) (quoting *K.H.*, 914 F.2d at 852 (declaring that "the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically.")). Thus, the state official's failure to remove the children from harm's way was constitutionally relevant because he retained custody over them and received reports detailing their condition. *See id.*

Custody, then, is paramount. In *Reed*, the Seventh Circuit reinforced this proposition when it cited *Smith v. District of Columbia* with approval. In that case, the D.C. Circuit considered an incident arising out of the District's placement of a so-called juvenile delinquent in an "independent living program," where youth live in program apartments under the supervision of program staff. *See* 413 F.3d 86, 89 (D.C. Cir. 2005). A private company ran this program and provided residential facilities for the juveniles. *See id.* After a horrific tragedy, the plaintiff sued the private

company. Again, although not its focus, the court presumed (as did the dissent) that the private entity was a state actor. *See id.* at 96 (naming the private child care provider a state actor). The court referred to the company as the District's "agent," *id.* at 94, said it had a "duty to look after him" to provide him with "daily care," *id.*, acknowledged it must monitor the child's progress, *see id.* at 95, and called the program a "government-controlled setting," *id.*

So, even if a state has a duty to the children in its custody, that duty cannot be "avoided by substituting private for public custodians." *K.H.*, 914 F.2d at 852. The state may, in fact, have a duty to monitor children placed with state actors. *See id.* at 852–53. If the state cannot avoid its duties to place or monitor a private institution, then that private institution should not be able to avoid the underlying duty to protect and care for the children in its care and custody. Based on that, the Maryville Defendants sued here are, in effect, the State's agents. Woods, therefore, may sue the Maryville Defendants as state actors to recover for the constitutional injuries he occurred while a state ward in private care.

This would not necessarily be the case if the Maryville Defendants were private-home foster parents. The Seventh Circuit assumed those individuals were not state actors in *K.H. See id.* at 852. But this is a different case. Here, the Maryville Defendants comprised a residential child care facility, "trained to provide day-to-day care for state wards," who "exercise[d] their professional duties" in looking out for the children. *Cf. Wallace v. Smyth,* 786 N.E.2d 980, 986–87 (Ill. 2002). In those

circumstances, the state fulfilled its duty by and through the Maryville Defendants, making them constitutional actors.

### 3. Maryville's Relationship with the State

"As temporary custodian, DCFS has the ultimate 'responsibility of physical possession of the minor and the duty to protect, train and discipline him and to provide him with food, shelter, education and ordinary medical care . . .'" *Cook Cty. Pub. Guardian v. D. Jean Ortega-Piron (In re A.H.)*, 748 N.E.2d 183, 190 (Ill. 2001) (quoting 705 ILCS 405/1–3(9)). In exercising that responsibility, DCFS places the child, and one of those options is an institutional setting, remaining effectively a DCFS facility. *See id.* (citations omitted); *see also In Interest of P.F., E.F.; People v. Sandy F., James F.*, 638 N.E.2d 716, 726 (Ill. App. Ct. 1994) ("The legislature has given DCFS the authority to contract with "any public or private agency" for the provision of services to people DCFS must serve.").

During this time, "the Department shall have the authority, responsibilities and duties that a legal custodian of the child would have . . ." *In Interest of Rami M.*, 673 N.E.2d 358, 363 (Ill. App. Ct. 1996) (internal brackets omitted). At bottom, the Department has wide discretion to assist and care for all neglected children. *See In Interest of P.F., E.F.; People*, 638 N.E.2d at 726; *see also In re R.M.*, 681 N.E.2d 652, 656 (Ill. App. Ct. 1997) (recognizing that once the court places a child with the Department, then it becomes the Department's prerogative to place the child in a specific setting).

In his complaint, Woods alleged that the State took him into protective custody as a ward of the State. (Dkt. 19 ¶ 1.) He claims that the State committed him to Maryville's care despite knowing the substantial risk of child abuse. *Id.* at ¶ 5. "The Maryville Defendants, acting under the authority conferred upon them by the State, created an unreasonably dangerous environment in which Mr. Woods was forced to live, and then acted with deliberate indifference to Mr. Woods' repeated reports of abuse." *Id.* Woods refers to Maryville as "an agent of the State" because it was "charged with caring for him on behalf of the State." *Id.* at ¶ 7. To that end, "DCFS contracted with Maryville Academy to care for some of the children who were in DCFS custody." *Id.* at ¶ 28. DCFS policy even required Maryville "to report an incident of abuse within 48 hours." *Id.* at ¶ 88.

Taken together, and viewed in the light most favorable to Woods, he sufficiently alleged the element of state action in his § 1983 claim. At this preliminary stage, these are plausible allegations that Maryville, by stepping into the shoes of the State in caring for children in its custody, became the State's agent and willfully participated in joint activity with the State. The Court can reasonably infer a close nexus between the two entities such that Maryville's actions may be fairly treated as the State's. Woods needed not do any more to cross the plausibility threshold. *Cf. Reed v. Palmer*, No. 18-1429, 2018 WL 4870351, at *8–9 (7th Cir. Oct. 9, 2018). He alleged that, as a ward, the State had custody over him and it fulfilled its corresponding duties of care and protection by delegating them to Maryville. That is enough for now.

Should discovery not show such a degree of involvement and intimacy, the Maryville Defendants remain free to raise the issue again at summary judgment.

*Letisha A. by Murphy v. Morgan*, relied on by the Maryville Defendants, does not persuade the Court nor is it contrary to this ruling. There, the court based its decision on three main reasons: (1) all that established the nexus between the State and the foster home was a contract; (2) the plaintiffs did not allege that the State directed the home or controlled, operated, or owned it; and (3) the complaint did not include facts that would add up to an agreement or conspiracy between the State and the foster home. *See, e.g.*, 855 F. Supp. 943, 948 (N.D. Ill. 1994). Additionally, the court observed that the State's regulatory control and enforcement was insufficient to form a symbiotic relationship between DCFS and the foster home. *See, e.g.*, *id.* at 948–49. Finally, the court reasoned that caring for abused and neglected children was not a traditionally exclusive function of the State because DCFS was only one of several potential legal custodians for those children. *See, e.g.*, *id.* at 949.

Unlike *Letisha A.*, Woods' complaint includes the necessary allegations that the State sent children to Maryville even though both of those parties knew or suspected child abuse at the facility. (Dkt. 19 ¶¶ 5, 7.) Woods alleged that the Maryville Defendants were agents of the State, clothed with the authority of the State, who acted on behalf of the State. *Id.* This claimed nexus is more than just a contract, although Woods also asserted that was a part of the relationship, too. *Id.* at ¶ 28. The complaint plausibly contends that DCFS, together with the Maryville Defendants, directed or controlled Maryville Academy through some form of agreement. *Id.*

at ¶¶ 5, 7.  It is not just that state law regulates the relationship between DCFS and Maryville, it establishes it in the first place.  Even if the custody and care of abused and neglected children is not an exclusive state function, the legal duties the State takes on and entrusts to the Maryville Defendants remain strong evidence that there was a sufficiently close nexus or symbiotic relationship between the two entities.  Indeed, the Maryville Defendants fulfilled the State's duty to care for the children in its custody.  That is what makes them state actors.  The Court accordingly denies the remaining Maryville Defendants' motion to dismiss Counts II and III.

## II.    Intentional Infliction of Emotional Distress (Count VI)

In Illinois, a plaintiff must allege the following elements to state a claim for intentional infliction of emotional distress: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was a high probability that the conduct would cause it); and (3) the defendant's conduct did in fact cause the distress.  *See Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)).  To "qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Id.* (quoting *Feltmeier*, 798 N.E.2d at 83).

It follows, then, that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not amount to extreme and outrageous conduct, nor does conduct characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* at 566–67 (quoting *Van Stan*

*v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (quoting *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)) (internal quotation marks omitted). "Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particular case." *Id.* at 567 (quoting *Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003)).

"[S]exual misconduct can form the basis of an intentional infliction of emotional distress claim." *See, e.g.*, *Alicia B. v. Sperlik*, No. 05 C 3229, 2005 WL 3299835, at *6 (N.D. Ill. Nov. 30, 2005) (citing *Feltmeier*, 798 N.E.2d at 75; *Parks v. Kownacki*, 737 N.E.2d 287 (Ill. 2000); *Pavlik v. Kornhaber*, 761 N.E.2d 175 (Ill. App. Ct. 2001)). Additionally, "the more power and control that a defendant has over a plaintiff, the more likely defendant's conduct will be deemed outrageous." *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). If the defendant knew that the plaintiff was particularly susceptible to emotional distress, then the defendant's behavior may be even more outrageous. *See id.* at 867 (citing *Fahey*, 533 N.E.2d at 811).

## A.    Board of Directors

To state a claim for intentional infliction of emotional distress, Woods must allege that the Board of Directors intended to inflict severe emotional distress on him or conducted itself knowing there was a high probability that it would cause Woods distress. *Cf. Maness v. Santa Fe Park Enterprises, Inc.*, 700 N.E.2d 194, 202 (Ill. App. Ct. 1998) (citing *Wells v. I F R Engineering Co.*, 617 N.E.2d 204 (Ill. App. Ct. 1993)). Woods failed to allege either that the Board intended to harm Woods or that it acted

with "substantial certainty" that harm would result. He does not claim that he complained to the Board or that any of its members relayed his pleas to the Board. Nor does Woods name the Board in one substantive paragraph in Count VI.

The best Woods can do is cite to Count II (not the intentional infliction of emotional distress claim, but the § 1983 claim against the Board, Ryan, Lewis, and Jameson) in his response and argue that the Board was aware of the risk of harm to Woods but they nonetheless failed to prevent it. (Dkt. 52 at 13 (citing Dkt. 19 ¶ 147).) This is plainly inconsistent with Woods' factual allegations. Reverend Ryan was the only board member Woods interacted with, and Woods contends that Ryan "did nothing" and "took no action" regarding Woods' requests for assistance. (Dkt. 19 ¶¶ 49, 73.) Based on that record, it would be unreasonable for the Court to infer that Reverend Ryan shared information with the Board.

There are simply no factual allegations in the complaint that the Board was on notice of the abuse. *See, e.g.*, *Alicia B. v. Sperlik*, No. 05 C 3229, 2005 WL 3299835, at *6 (N.D. Ill. Nov. 30, 2005); *Doe v. Woodridge Elementary Sch. Dist. No. 68 Bd. of Educ.*, No. 04 C 8250, 2005 WL 910732, at *5 (N.D. Ill. Apr. 13, 2005). Should discovery reveal otherwise, Woods may replead the count against the board member defendants. As it stands now though, because Woods does not contend that the Board received repeated complaints of Woods' sexual abuse but was deliberately indifferent to them, the Court grants the Board's motion to dismiss Count VI as it pertains to the Board.

### B.     Reverend Ryan

Reverend Ryan claims that Woods' allegations fall short of the heightened pleading standard for an intentional infliction of emotional distress claim. In other words, Ryan argues his alleged conduct was not extreme and outrageous. Taking all Woods' well-pleaded facts as true, however, Woods did in fact state a claim. Woods alleges that he reported the first series of incidents of physical abuse as well as the second series of incidents of sexual abuse to Reverend Ryan. (Dkt. 19 ¶¶ 44–49, 70–73.) He described the abuse to Ryan and complained that Maryville was not doing anything to stop it. *Id.* Both times, Ryan assured Woods that he would put an end to the trauma, but he never did. *Id.*

First, Ryan's deliberate indifference to Woods' repeated complaints of abuse was extreme and outrageous. *See, e.g.*, *Alicia B.*, 2005 WL 3299835 at *6; *Doe*, 2005 WL 910732 at *5. This conduct was even more egregious because Ryan was the Executive Director of Maryville and thus exhibited power and control over Woods. *See Graham*, 742 N.E.2d at 866. In addition, Woods was a twelve-year-old boy at the time, already a victim of past abuse and neglect, as all children were who stayed at Maryville. Ryan therefore knew Woods was susceptible to this distress in more ways than one: Woods was a child, he was a survivor, and he already relied on Ryan once to help him but to no avail.

Second, at the very least, Ryan knew there was a high probability that his inaction would cause Woods severe emotional distress. Plainly, the abuse was recurring and volatile. Ryan knew after the second complaint Woods made directly to him

that it was not likely to stop absent some intervention because it did not end when Ryan failed to act the first time around. Third, Ryan's failure to protect Woods from abuse after twice being put on notice of several incidents caused Woods severe emotional distress. (Dkt. 19 ¶ 173.) Woods alleges that Ryan—charged with his care—ignored his cries for help and that emboldened his attacker to escalate the abuse. *Id.* at ¶¶ 49, 55. This inaction by those in authority with complete control over Woods' life left him with nowhere to turn, further devastating a helpless Woods. The Court accordingly denies Ryan's motion to dismiss Count VI against him because Woods stated a claim for intentional infliction of emotional distress that is plausible on its face.

## III.    Supplemental Jurisdiction

Because Woods sufficiently stated federal claims under § 1983, this Court retains jurisdiction over the remaining state-law claims for negligence (Count IV), respondeat superior (Count V), and intentional infliction of emotional distress (Count VI) because all claims arise out of a common nucleus of operative facts. *See Olson v. Bemis Co.*, 800 F.3d 296, 302 (7th Cir. 2015) (quoting *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015), then citing 28 U.S.C. § 1367(a)).

## CONCLUSION

For the reasons stated above, the Court grants McDonald's motion to dismiss Count I, grants the Board of Directors' motion to dismiss Counts II and VI as they relate to the Board but denies the motion as to the other Maryville Defendants, including Reverend Ryan, and denies Maryville Academy's motion to dismiss Count III because Woods plausibly alleged state action.

Virginia M. Kendall
United States District Judge

Date: November 19, 2018